JOSEPHINE C. BOWEN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 87219. Promulgated February 23, 1938.

*John C. Evans, Esq.,* for the petitioner.
*Frank T. Horner, Esq.,* and *Harold F. Noneman, Esq.,* for the respondent.

OPINION.

VAN FOSSAN: This proceeding was brought to redetermine a deficiency in the income tax of petitioner for the calendar year 1934 in the sum of $40.80.

The question for our determination is whether the following described transactions constituted a "sale or exchange" of certain mortgage interests for bonds of the Home Owners' Loan Corporation, or a payment therefor.

The facts in the case are stipulated in substance as follows:

On or about June 1, 1921, one William Downie and his wife borrowed from one Walter J. Taylor the sum of $2,800 and on that date executed a note payable in five years. This note was secured by a first mortgage in the principal sum of $2,800 on real property located at 9745 Prairie Avenue, Detroit, Michigan.

On October 20, 1922, Downie and his wife executed a warranty deed to one Angus McLean, guardian of Lyman Fuller and Hugh M. Fuller, minors, conveying the above mentioned property to him subject to the aforesaid mortgage.

On August 30, 1927, Taylor and his wife assigned the mortgage and mortgage note to petitioner, who paid therefor the sum of $2,800, that being the principal sum then owing on the mortgage note.

On the same date, McLean and his wife and Joseph J. Brown and his wife borrowed from petitioner the sum of $700 and executed a note on that date for that amount payable in three years and giving petitioner as security for the repayment of the $700 a second mortgage on the same real property.

On December 4, 1933, Brown, who was then the owner of the property, made application to the Home Owners' Loan Corporation for a loan thereon.

On December 16, 1933, the Home Owners' Loan Corporation mailed petitioner's attorney a form letter stating that the application had been made and seeking certain information with respect to the mortgages. In answer to one of the questions in this questionnaire petitioner stated that she was willing to take bonds of the Home Owners' Loan Corporation for her equity in the property.

On January 19, 1934, the principal balance owing on the two mortgage notes above referred to was $3,500.

On that date the Home Owners' Loan Corporation addressed to petitioner a letter offering the sum of $3,100 net in the bonds of the Home Owners' Loan Corporation for her first and second mortgagee's equity in the property.

On January 23, 1934, petitioner executed a "Mortgagees' Consent to Take Bonds" in the amount of $3,100 net in full settlement of her claim under the two mortgages as aforesaid.

On February 1, 1934, petitioner executed a discharge of the June 1, 1921, and the August 30, 1927, mortgages and delivered the same together with the notes for $2,800 and $700 secured thereby to the Home Owners' Loan Corporation. These discharges were recorded in the office of the register of deeds for Wayne County, Michigan, on June 5, 1934.

On May 16, 1934, petitioner signed an "Authorization For Delivery of Bonds of Home Owners' Loan Corporation" and transmitted the same to the Home Owners' Loan Corporation. It was recited therein that the loan to Brown and his wife "has been duly and regularly closed and that the obligation and instrument securing the same of said borrower or borrowers have been received and that the above-mentioned holder of this authorization is entitled to the bonds * * *."

On the same date, May 16, 1934, Brown and his wife executed a note to the Home Owners' Loan Corporation bearing that date and as security therefor gave a mortgage to the corporation on the real property above referred to in the amount of $4,306.08. This mortgage was duly recorded on June 5, 1934.

On May 28, 1934, Brown and his wife executed a "Statement of Applicant for Compliance with section 4 (1) of Home Owners' Loan Act as Amended" to the effect that the mortgage was in involuntary default and that he was unable to carry or refund the indebtedness and that the default was due to unemployment or to economic conditions or misfortune beyond his control.

On June 29, 1934, petitioner received an even date letter from the Home Owners' Loan Corporation advising that it was holding funds payable to her in the amount of $3,100 and requesting that they be advised as to what banker or trust company petitioner wished the permanent bonds delivered through.

On April 2, 1934 (sic), (August 2, 1934?) petitioner actually received Home Owners' Loan Corporation bonds in the principal amount of $3,075 and cash in the amount of $21.75 in consideration of the surrender of the notes for $2,800 and $700, respectively, and the execution of the discharge of the mortgages above referred to. The bonds and cash were delivered to petitioner through the Manufacturers' National Bank of Detroit.

A similar series of transactions occurred with reference to other property, as follows:

On August 8, 1927, Selina Williams borrowed from petitioner the sum of $2,600 and gave an even dated note for that amount as evidence of the indebtedness and executed a mortgage in the principal amount of $2,600 on lot 60, Gamble and Fisher Subdivision in the city of Detroit, Michigan, as security for the repayment.

On August 30, 1933, Frank Lachowski, the contract purchaser of the property securing the mortgage last above mentioned made an application to the Home Owners' Loan Corporation for a loan on the premises.

On December 19, 1933, the Home Owners' Loan Corporation mailed petitioner a similar questionnaire concerning the mortgage as was mailed petitioner in the Brown case and petitioner also here indicated her willingness to take bonds of the Home Owners' Loan Corporation for her equity.

On December 19, 1933, the principal balance owing on the mortgage was $2,600.

Shortly thereafter, petitioner received from the Home Owners' Loan Corporation a letter similar to the one she had received in the Brown case offering the sum of $2,000 net in bonds of the Home Owners' Loan Corporation in satisfaction of her mortgagee's interest in the last above mentioned property.

On February 7, 1934, petitioner executed a "Mortgagee's Consent to Take Bonds" in the sum of $2,000 net as full settlement of her claim against the property under the mortgage.

On June 27, 1934, petitioner properly executed a discharge of the mortgage last above described and delivered it together with the $2,600 note to the corporation.

On July 19, 1934, petitioner signed an "Authorization of Delivery of Bonds of Home Owners' Loan Corporation" and transmitted the same to the Home Owners' Loan Corporation. This authorization is identical in form with the authorization in the Brown case and likewise states that the loan "has been duly and regularly closed and that the obligation and instrument securing the same of said borrower or borrowers have been received and that the above-mentioned holder of this authorization is entitled to the bonds  *  *  *."

On July 23, 1934, Lachowski executed a "Statement of Applicant for Compliance with Section 4 (1) of Home Owners' Loan Act as Amended." The form of this statement is to the same effect as that used in the Brown case.

On September 11, 1934, petitioner received bonds of the Home Owners' Loan Corporation in the principal amount of $1,975 and cash in the amount of $12.30 in consideration of the execution of the discharge of the mortgage and the surrender of the $2,600 note. The bonds and cash were delivered to the petitioner through the Manufacturers' National Bank of Detroit.

Petitioner paid a service fee of $4 to the agent through which the Home Owners' Loan Corporation made delivery of the bonds and $20 to one Lloyd L. Axford for legal services rendered in connection with the settlement of the mortgages.

In filing her income tax return for 1934 petitioner claimed a deduction of $1,024 for loss sustained in the above related transactions. The amount of the loss was arrived at by deducting the total amount received in settlement of the mortgages from the total cost of these mortgages. The amount of the loss thus figured was $1,000, to which was added $24 expenses incident to the settlement.

The Commissioner disallowed this deduction in part on the grounds, as he advised the taxpayer, that "inasmuch as the property exchanged represented capital assets as defined in section 117 (b) of the Revenue Act of 1934, and the assets were held for more than five years but not more than 10 years, the loss is recognized to the extent of 40 per cent or $409.60 as provided in section 117 (a) of the Revenue Act of 1934." [1]

It is apparently conceded that, in order for the loss properly to be considered as a capital loss, the transaction must have been a "sale or exchange" as distinguished from a "payment."

The question presented then, is whether the transaction, as outlined, constituted a "sale or exchange" so as to bring a resulting loss within the provisions of section 117 of the Revenue Act of 1934, as a capital loss, or whether the transaction effected a "payment" resulting in an ordinary loss under section 23 (e) (2). The amount of the loss is not in controversy.

Petitioner contends that she suffered an ordinary loss and not a capital loss by reason of the transaction because the corporation bonds which she received in return for a discharge of her mortgages were given as payment of a debt or obligation and that the loss resulting is an ordinary loss arising out of the transaction entered into for profit.

Respondent, on the other hand, claims that the loss resulting from the transaction is a capital loss arising out of the "sale or exchange" of a capital asset.

We are of the opinion that the contention urged by the respondent is the only tenable one.

The applicable part of the statute under which the corporation operates (48 Stat. 128, 130) and of which we take judicial notice, authorizes it to acquire "in exchange" for bonds issued by it, home mortgages and other obligations and liens secured by real estate.

---

[1] SEC. 117. CAPITAL GAINS AND LOSSES.

(a) GENERAL RULE.—In the case of a taxpayer, other than a corporation, only the following percentages of the gain or loss recognized upon the sale or exchange of a capital asset shall be taken into account in computing net income:

\*       \*       \*       \*       \*       \*       \*

40 per centum if the capital asset has been held for more than 5 years but not for more than 10 years;

\*       \*       \*       \*       \*       \*       \*

Consistently, throughout the act the transaction is denominated an exchange. While this is not conclusive, it is persuasive.

In addition, what actually transpired, we believe, can spell nothing but exchange. As to petitioner there was no payment. The usual and ordinary meaning of the word "payment" is the discharge of an obligation in money, unless the agreement provides for its discharge by other means. The fixed terms of the obligations in question could not have contemplated their satisfaction in terms of the corporation's bonds.

What petitioner did here was to exchange one form of indebtedness for another. This Board has frequently had before it cases where owners of bonds and other like evidences of indebtedness have accepted for such bonds or indebtedness other forms of property. In these cases the Board has consistently referred to the transaction as an "exchange." *Sunflower Packing Corporation*, 2 B. T. A. 1104; *Turners Falls Power & Electric Co.*, 15 B. T. A. 983; *Henry Heldt*, 16 B. T. A. 1035; *Nat Webb, Jr.*, 22 B. T. A. 1249; *Chemical National Bank of New York*, 30 B. T. A. 178.

Petitioner relies strongly on the case of *John H. Watson, Jr.*, 27 B. T. A. 463, and subsequent cases following the rule there established, that the redemption of a bond, either at maturity or pursuant to an authorized call prior to maturity is not a sale or exchange, but a payment. The present situation is not analagous for there was no discharge of petitioner's obligations by reason of cash settlements. True, the mortgages were satisfied and on the exchange petitioner received bonds having a money value, but petitioner was not paid. She received bonds in exchange for her interests in the mortgages.

In *John H. Watson, Jr., supra*, it was said in regard to the terms there under consideration:

> The words "sale or exchange" are ordinary words of well established meaning. Taken in their context they are susceptible of no misconstruction. Payment of the amounts specified in the bonds, either at maturity or pursuant to an authorized call prior to maturity, is not a "sale or exchange" of such bonds. It is merely the payment of an obligation according to its fixed terms.

The quoted observations are equally pertinent here.

The result of the present transaction was not a payment as contemplated by the original agreement nor a payment as a result of a novation. The parties themselves changed and the transaction was accomplished by the corporation offering the mortgagee certain bonds in lieu of, or exchange for, the mortgage indebtedness.

Though the original mortgages have been satisfied the obligation to petitioner still exists. The debtor-creditor relationship persists as to both parties, that is, petitioner must look to the corporation for payment, and the original mortgagor must pay the corporation. We

have but a substitution, or shifting, of liability rather than a dissolution of liability as contemplated in a payment.

The above is the substance of the transaction notwithstanding the recital in the "Mortgagee's Consent To Take Bonds", that the bonds will be accepted "to release all the claim * * * against said property", and the fact that "discharges" were recorded. The latter we believe to be but a matter of form.

We have carefully considered the petitioner's arguments based upon the theory that the corporation was acting in the place and stead of the mortgagors, but do not find ourselves in accord with this view.

No argument has been advanced, nor could any be successfully maintained, that petitioner's interest in the mortgages was not a capital asset within the scope of section 117 (b).[2] Obviously, the mortgages were property within the definition.

Accordingly, we hold the transaction to be within the terms of the statute as a "sale or exchange", and the loss, therefore, a capital loss.

*Decision will be entered for the respondent.*

---

[2] SEC. 117. CAPITAL GAINS AND LOSSES.
    *        *        *        *        *        *        *
  (b) DEFINITION OF CAPITAL ASSETS.—For the purposes of this title, "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.